**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X  Case No.: 25-cv-02679-JPO
VIVIAN McLEAN,

                                    Plaintiff,

                                                                    **FIRST AMENDED**
                    -against-                                        **COMPLAINT**


LENDBUZZ FUNDING LLC,
SPARTAN AUTO GROUP LLC d/b/a Victory
Mitsubishi and VICTORY AUTO GROUP LLC
d/b/a Victory Mitsubishi,

                                    Defendants.
-----------------------------------------------------------------X

         Plaintiff, by and through his attorneys, KIDD LAW GROUP PLLC,

upon knowledge as to himself and his own acts, and as to all other matters upon

information and belief, brings this complaint against above-named defendants and in

support thereof alleges the following:

                            <u>INTRODUCTION</u>

         1.      Plaintiff, Vivian McLean, is a young man with a big dream. He

dreams of becoming a commercial airline pilot. Commercial airline aviator is a

profession which is in sharp demand and in which there has been a shortage for several

years. The growing scarcity is well known, with many news media carrying stories

highlighting the dangers of the nation's deepening pilot shortage. See, for example,

<u>https://newschannel9.com/news/local/arc-chattanooga/pilot-shortage-looms-as-faa-</u>

<u>retirement-rule-leaves-gaps-in-workforce</u> ("Pilot shortage looms as FAA retirement rule

1

leaves gaps in workforce"–ABC News Channel 9 in Cleveland, TN on October 14, 2024) (last visited March 31, 2025).

2.    Towards the end of commencing his education to become an airline pilot in 2024, Mr. McLean has, for the last several years leading up to March 2024, worked six days per week for 60 hours each week, taking the bus to and from work at his warehouse job, whether snow, rain or shine, in order to save up enough money to make a substantial down payment on a used car that would provide him with reliable, personal transportation. The car would be his first car and, having been raised by a single mother, he was proud that he had accomplished his goal by dint of his industry. The car would assist him in achieving the much more significant goal, that of becoming a much-needed airline pilot. Unfortunately for Mr. McLean, he happened upon defendants and his dreams were thereby shattered.

3.    Defendant car dealership Victory Mitsubishi remains undaunted by the enforcement action taken by the Attorney General of the State of New York in 2017, in which the State obtained a Court Order permanently enjoining Victory Mitsubishi from engaging in illegal, fraudulent and deceptive sales tactics and other deceptive practices against consumers and directing Victory Mitsubishi to pay to defrauded consumers restitution, damages and civil penalties. Far from abiding by the Court Order and ceasing its unlawful conduct, Victory Mitsubishi boldly continues its illegal business practices by defrauding car buyers, including the hapless Mr. McLean.

4.      Attached as **Exhibit 1** is the New York Attorney General's Petition against Victory Mitsubishi and a related dealership for repeated fraud and illegal conduct against consumers.

5.      Attached as **Exhibit 2** is the Decision & Order of the New York State Supreme Court, finding "a pattern of deceptive and misleading conduct, and repeated fraud on the part of respondents." *Id*. at 10. The Court held that Victory Mitsubishi and the related dealership had violated New York General Business Law § 349 by engaging in deceptive business practices and had committed fraud within the meaning of New York Executive Law § 63 by repeatedly charging consumers for add-on products without the consumers' knowledge or consent. Finding that the dealerships had a practice of not allowing consumers to read -0sale documents before requiring consumers to sign, the Court was unpersuaded by the protestations of Victory Mitsubishi and the related dealership that the defrauded consumers were not actually defrauded because documents contained the consumers' purported signatures.

6.      Attached as **Exhibit 3** is the Stipulation of Settlement and Order entered into between Victory Mitsubishi and the related dealership, on the one hand, and the Attorney General, on the other hand.

7.      Victory Mitsubishi knew of said Stipulation of Settlement and Order on the date Mr. McLean bought the vehicle.

8.      By contrast, Mr. McLean knew nothing about this enforcement action by New York State and did not know that Victory Mitsubishi was and is a recidivist and apparent incorrigible offender. In March 2024 when Mr. McLean visited

3

Victory Mitsubishi to view and purchase a vehicle he had seen advertised for sale online, defendants defrauded him, including but not limited to, by: (i) increasing the price of the car he would eventually purchase by nearly $10,000, thereby negating his $10,000 down payment; (ii) selling him numerous unwanted add-on products and services without his knowledge or consent, including but not limited to: guaranteed asset protection ("GAP") insurance and vendor's single interest ("VSI") insurance; (iii) obtaining auto insurance on his behalf which was shortly cancelled due to defendants' misrepresentation, thereby leaving him without insurance coverage; (iv) attaching his purported electronic signature and initials to sale documents without his knowledge or consent; (v) failing to allow him to review paper documents before requiring him to sign them; (vi) failing to provide to him a copy of all documents required to be provided by applicable law; (vii) selling him a car while failing to disclose to him that the car had been involved in at least two collisions; (viii) selling him a car while failing to disclose to him that the car had an open and unrepaired safety recall; (ix) selling him a car with numerous mechanical defects, including but not limited to: airbag defective; fuel pump defective; battery defective; engine shutting off; myriad electrical defects; wheels misaligned; tires unbalanced, damaged and badly repaired car panels.  Indeed, the car was at the date of delivery–and remains–a danger to all road users, in that due to its many defects the engine would abruptly shut off while the car was in operation, the car shuddered and swerved even at moderate rates of speed and was incapable of remaining in lane without considerable steering effort from the driver.

9.    After Mr. McLean repeatedly telephoned Victory Mitsubishi to complain about both the fraudulent paperwork and the mechanically defective car but received no meaningful response let alone assistance, he requested assistance from defendant Lendbuzz Funding LLC (or "Lendbuzz"), which declined to provide him any help, referring him back to Victory Mitsubishi. Defendants have refused to unwind the sale, re-take possession of the car and refund to Mr. McLean his $10,000 down payment.

10.    So as to protect his burgeoning credit rating, Mr. McLean has been obliged to continue to make timely monthly payments to Lendbuzz for the fraudulently exorbitant loan.

11.    Automobile dealers and finance companies that perpetrate these fraudulent, abusive and oppressive acts on unsophisticated and unsuspecting consumers are bound to cause and do cause increased financial burdens and feelings of distress and helplessness in consumers, who often do not know what to do when a calamity such as this befalls them.

12.    Further, fraudulent automobile dealers and lenders like defendants unfairly place honest, law-abiding dealers and lenders at a competitive disadvantage, thereby harming the marketplace.

13.    Having been unable to obtain any relief from defendants, Plaintiff brings this action to right defendants' wrongs.

14.    Plaintiff brings this action seeking, at his option, rescission of the retail installment contract due to fraud, and restitution damages; damages against defendants pursuant to the federal Truth in Lending Act (or "TILA"), 15 U.S.C. § 1601 *et*

5

*seq*.; damages against defendants pursuant to the Electronic Fund Transfer Act (or "the

EFTA"), 15 U.S.C. § 1693, *et seq*.; damages against defendants pursuant to the

Magnuson-Moss Warranty Act (or "MMWA"), 15 U.S.C. § 2301 *et seq*., as well as

pursuant to the New York Vehicle and Traffic Law (or "NYVTL") § 417, 15 NYCRR

78.13(c) and 15 NYCRR 79.2; injunctive relief and damages against defendants pursuant

to New York General Business Law ("NYGBL") § 349 for defendants' deceptive acts

and practices; damages against defendants for common-law fraud; damages against

defendants for conversion; and damages against Lendbuzz pursuant to NYGBL § 349 for

deceptive acts and practices.

<u>JURISDICTION AND VENUE</u>

15.    Plaintiff re-alleges paragraphs 1-14 as if fully re-stated herein.

16.    This Court has federal jurisdiction pursuant to the Truth in

Lending Act, 15 U.S.C. § 1640(e); the Electronic Fund Transfer Act, 15 U.S.C. § 1693;

the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310; and 28 U.S.C. § 1331.

Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367 as

they arise out of the same set of transactions forming the basis of the federal claims.

17.    This Court has venue pursuant to 28 U.S.C. § 1391(b) in that

a substantial portion of the events or omissions giving rise to this action occurred

in this District.

<u>PARTIES</u>

18.    Plaintiff re-alleges paragraphs 1-17 as if fully re-stated herein.

19.    Plaintiff is a natural person who at all relevant times resided in

Hartford County, State of Connecticut.

20.    Upon information and belief, defendant Lendbuzz Funding LLC was at all relevant times and is a foreign limited liability company formed under the laws of the State of Delaware.

21.    Upon information and belief, Lendbuzz was and is authorized to do business and doing business in the State of New York.

22.    Lendbuzz is a sub-prime lender.

23.    A court of law has described Lendbuzz as a sub-prime lender.

24.    Lendbuzz primarily lends to borrowers who have no credit rating or who have low credit scores.

25.    More than one state has engaged in an enforcement action against Lendbuzz for Lendbuzz's violation of the consumer or financial laws of said states.

26.    Defendant Spartan Auto Group LLC is a domestic limited liability company with a principal place of business in Bronx County, State of New York.

27.    Spartan Auto Group LLC's principal place of business was at all relevant times and is located at 4101 Boston Road, Bronx, New York 10466.

28.    Spartan Auto Group LLC did at all relevant times and does business as "Victory Mitsubishi".

29.    "Victory Mitsubishi" is an assumed name of Spartan Auto Group LLC in the records of the New York State Secretary of State.

30.    Spartan Auto Group LLC is a retail dealer in new and used automobiles.

31.     The net worth of Spartan Auto Group LLC is greater than Four Million Dollars ($4,000,000).

32.     Defendant Victory Auto Group LLC is a domestic limited liability company with a principal place of business in Bronx County, State of New York.

33.     Victory Auto Group LLC's principal place of business was at all relevant times and is located at 4101 Boston Road, Bronx, New York 10466.

34.     Victory Auto Group LLC did at all relevant times and does business as "Victory Mitsubishi"

35.     "Victory Mitsubishi" is an assumed name of Victory Auto Group LLC in the records of the New York State Secretary of State.

36.     Victory Auto Group LLC is a retail dealer in new and used automobiles.

37.     The net worth of Victory Auto Group LLC is greater than Four Million Dollars ($4,000,000).

38.     Spartan Auto Group LLC and Victory Auto Group LLC are related by common ownership.

39.     Spartan Auto Group LLC and Victory Auto Group LLC are affiliated by corporate control.

40.     Spartan Auto Group LLC and Victory Auto Group LLC are jointly and severally liable to Plaintiff for the violations alleged against Victory Mitsubishi herein.

41.     Spartan Auto Group LLC and Victory Auto Group LLC have hereinabove been and shall hereinafter be referred to together as "Victory Mitsubishi" or the "Dealership".

42.     The Dealership is the same entity as Victory Motors, LLC, doing business as Victory Mitsubishi.

43.     The Dealership is related by common ownership to Victory Motors, LLC, doing business as Victory Mitsubishi.

44.     The Dealership is affiliated by corporate control with Victory Motors, LLC, doing business as Victory Mitsubishi.

45.     The Dealership is the same entity as Victory Auto Group, LLC, doing business as Victory Suzuki.

46.     The Dealership is related by common ownership to Victory Auto Group, LLC, doing business as Victory Suzuki.

47.     The Dealership is affiliated by corporate control with Victory Auto Group, LLC, doing business as Victory Suzuki.

48.     The Dealership occupy the same premises in the Bronx occupied by Victory Auto Group, LLC, doing business as Victory Suzuki.

49.     Plaintiff entered into a consumer credit transaction with Victory Mitsubishi as contemplated by 15 U.S.C. § 1602(i), in that the money, property or services which were the subject of the transaction were primarily for Plaintiff's personal, family or household purposes.

50.    Victory Mitsubishi is a "creditor" within the meaning of 15 U.S.C. § 1602(g) and 12 C.F.R. § 226.2(a)(17) because at all relevant times Victory Mitsubishi, in the ordinary course of its business, regularly extended consumer credit which is payable in more than four installments or for which the payment of a finance charge is or may be required, and Victory Mitsubishi is the person to whom the debt arising from the consumer credit transaction was initially payable.

51.    The consumer transaction out of which this action arose is a transaction pursuant to the Federal Trade Commission "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

52.    Victory Mitsubishi assigned Plaintiff's retail installment contract (or "RIC") to Lendbuzz.

53.    Lendbuzz was an assignee of Plaintiff's loan from Victory Mitsubishi.

54.    As regards Plaintiff, Lendbuzz is an indirect lender.

55.    Before Plaintiff's purchase of the car from Victory Mitsubishi, Lendbuzz had no relationship with Plaintiff.

56.    Before Plaintiff's purchase of the car from Victory Mitsubishi, Plaintiff had no account with Lendbuzz.

57.    Before Victory Mitsubishi mentioned Lendbuzz to Plaintiff on the day Plaintiff purchased the car, Plaintiff had never heard about Lendbuzz.

58.    Victory Mitsubishi located Lendbuzz as the financier of Plaintiff's auto loan.

59.    On March 30, 2024, Plaintiff did not directly request financing from Lendbuzz.

60.    On March 30, 2024, Plaintiff did not directly communicate with Lendbuzz.

61.    Plaintiff did not directly contract with Lendbuzz.

62.    Lendbuzz obtained Plaintiff's loan.

63.    Lendbuzz obtained Plaintiff's loan from Victory Mitsubishi.

64.    Lendbuzz should have obtained Plaintiff's loan from Victory Mitsubishi.

65.    The consumer transaction out of which this action arose is a transaction pursuant to the Federal Trade Commission "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

66.    Lendbuzz is subject to aforesaid Holder Rules as concerns Plaintiff's indirect loan with Lendbuzz.

67.    Lendbuzz is liable to Plaintiff for its own misconduct and, by virtue of the Holder Rules, is jointly and severally liable with Victory Mitsubishi to Plaintiff for the misconduct of Victory Mitsubishi herein.

## FACTUAL ALLEGATIONS

68.     Plaintiff re-alleges paragraphs 1-67 as if fully re-stated herein.

69.     In late March 2024, Plaintiff saw advertised online a 2020 Honda Accord with just under 27,000 miles offered for sale by the Dealership for a price of $16,193.

70.     Plaintiff was interested in purchasing said car, so he contacted the Dealership before setting off for the Dealership that morning and the Dealership assured him that the car was still available for his purchase.

71.     On March 30, 2024, Plaintiff, accompanied by others, travelled more than an hour and a half from Hartford, CT to the Dealership in the Bronx to view and purchase the car.

72.     When Plaintiff arrived at the Dealership, Plaintiff met Victor Rivera ("Victor").

73.     On March 30, 2024, Victor was a salesman at the Dealership.

74.     On March 30, 2024, Victor was the salesman at the Dealership who dealt with Plaintiff.

75.     At the date of the filing of this action, Victor was a salesman at the Dealership.

76.     At the date of the filing of this action, Victor was an employee of the Dealership.

77.     At the date of the filing of this complaint, Victor is an employee of the Dealership.

78.    Plaintiff informed Victor of the Honda sedan which he had arrived see.

79.    Victor told Plaintiff that the car was no longer available for his purchase because someone had recently placed a down payment on it and the sale papers were being signed at that moment.

80.    Plaintiff was surprised at this news, since the Dealership had assured him that the car was still available for purchase when he inquired only a short time before.

81.    Victor told Plaintiff to look around and select a different car.

82.    Plaintiff looked at three cars but selected one for a test drive, which the car performed satisfactorily.

83.    Back in the Dealership's building, when Victor told Plaintiff the pricing on the car, Plaintiff declined purchasing it, informing Victor that he had a strict budget and the car was too expensive for his budget.

84.    Plaintiff told Victor that he was going to leave, since the car which he went to the Dealership to see in the first place was not available as the Dealership had told him it was and the next car he liked was too expensive.

85.    At that, Victor asked Plaintiff not to leave, urging Plaintiff to choose a different car to buy.

86.    Plaintiff then asked Victor about a 2019 Honda Accord bearing vehicle identification number 1HGCV1F11KA052191 (the "Vehicle").

87.    Plaintiff did not test drive the Vehicle but it was one of the three cars

which Plaintiff had viewed in the lot.

88.    When Plaintiff viewed the Vehicle in the lot, he had noticed that the price advertised on the Vehicle was $23,000 plus, but under $24,000.

89.    The price Plaintiff observed was less than $24,000.

90.    The Dealership advertised the price on the Vehicle in the lot as $23,000 plus, but less than $24,000.

91.    Because Plaintiff did not wish to buy a car which had been in an accident, Plaintiff asked Victor if the Vehicle had been involved any accident.

92.    Victor told Plaintiff that the Vehicle had not been involved in any accident.

93.    Plaintiff stressed to Victor that he did not want to buy a Vehicle which had been in an accident and asked Victor again if the Vehicle had been involved in any accident.

94.    Victor again assured Plaintiff that the Vehicle had not been involved in any accident.

95.    Victor told Plaintiff that the Dealership had recently inspected the Vehicle, the Vehicle was in good working condition, had no mechanical problem and drove well.

96.    Plaintiff then asked Victor for the price of the Vehicle and Victor told Plaintiff that the price was $23,124.

97.    Plaintiff agreed with Victor to purchase the Vehicle for the price of $23,124.

98.     Victor, on behalf of the Dealership, agreed with Plaintiff to sell the Vehicle for the price of $23,124.

99.     The total "out the door" price to which Plaintiff agreed after the addition of the customary government fees and charges was $25,384.45.

100.    Victor, on behalf of the Dealership, agreed with Plaintiff to sell the Vehicle for the total "out the door" price of $25,384.45.

101.    Plaintiff made a down payment of $10,000 to the Dealership.

102.    The Dealership received a down payment of $10,000 from Plaintiff.

103.    Victor assured Plaintiff that, of course, the $10,000 would be subtracted from the $25,384.45 total price for a loan amount of $15,384.45.

104.    Plaintiff reasonably expected the loan amount to be no more than $15,384.45.

105.    Plaintiff knew that he could manage to make the monthly payments comfortably on a loan of $15,384.45.

106.    As this was Plaintiff's first time buying a Vehicle, Plaintiff did not have existing auto insurance.

107.    Victor told Plaintiff he could obtain auto insurance for him.

108.    Plaintiff did not see any application form for insurance, did not fill out any application for insurance, did not communicate with anyone from any insurance company, did not provide any documentation to anyone from any insurance company, and did not open any account or policy with any insurance company.

109.    Victor did not show or tell Plaintiff what information or documents, if any, Victor or anyone else from the Dealership was providing to the insurance company and, because this was Plaintiff's first time obtaining auto insurance, Plaintiff did not know what to expect in the process.

110.    Victor arranged with the insurance company Plaintiff's auto insurance.

111.    A Dealership employee or employees arranged with the insurance company Plaintiff's auto insurance.

112.    After making Plaintiff wait for several hours, Victor then told Plaintiff that he had obtained insurance for him and that the premium was $273 per month for six months.

113.    Plaintiff thought that $273 per month was just over his budget but decided to proceed with the purchase of the Vehicle and told Victor that the $273 monthly insurance premium was okay.

114.    Victor then had Plaintiff sign and initial certain documents which Victor did not allow Plaintiff to read, instead using one hand to cover up the text on each page and the other hand to direct Plaintiff to where he wanted Plaintiff to either sign or initial.

115.    Victor did not ask Plaintiff to sign or initial electronically, and Plaintiff did not sign or initial electronically any document presented to him by Victor.

116.    Victor informed Plaintiff that the Dealership had found a finance company for his loan by the name of Lendbuzz.

117.    Plaintiff had never heard of Lendbuzz before this.

118.    Before this, Plaintiff had never had any account with Lendbuzz.

119.    Before this, Plaintiff had never done any business with Lendbuzz and had never had a relationship with Lendbuzz.

120.    Plaintiff did not speak with anyone from Lendbuzz while he was at the Dealership on March 30, 2024.

121.    No-one from Lendbuzz spoke with Plaintiff while he was at the Dealership on March 30, 2024.

122.    Victor informed Plaintiff that he had to give him (Victor) his bank account number and bank routing number so that the loan payments could be automatically deducted from Plaintiff's account by autopay.

123.    Victor did not give Plaintiff a choice as to whether Lendbuzz would receive the loan payments from him in some way other than autopay.

124.    In fact, Victor impressed on Plaintiff that Plaintiff would only get the loan if the payments were deducted from his account by preauthorized electronic fund transfers (auto pay).

125.    Plaintiff gave Victor his bank account number and bank routing number.

126.    Plaintiff did not give Victor or anyone else any other banking information, nor did Plaintiff authorize any defendant to access his banking information on March 30, 2024 for any purpose.

127.   Plaintiff did not ask for any add-on product or service.

128.   Victor did not ask Plaintiff if Plaintiff desired to purchase any add-on product or service.

129.   On March 30, 2024, Plaintiff arrived at the Dealership at approximately 12 noon and did not leave the Dealership until approximately 9 p.m., with much of that time spent waiting for Dealership personnel to attend to him.

130.   At points during those long hours, Victor took Plaintiff's mobile telephone and accessed various applications on it, without Plaintiff's knowledge or consent.

131.   The Dealership delivered the Vehicle to Plaintiff in the night on March 30, 2024.

132.   Shortly thereafter, in or about April 2024, Plaintiff received a form from the insurance company, threatening to cancel his insurance if he did not answer certain questions.

133.   Plaintiff was taken aback at this, because he believed the Dealership that everything had been arranged with his insurance coverage.

134.   Plaintiff tried to log into his account on the insurance company's website, but quickly realized that he needed to input username and password credentials that he did not know and which no-one from the Dealership had provided to him.

135.   Plaintiff tried to contact Victor several times before Victor gave him some of the information he needed; but Victor refused to provide all of the information, despite repeated requests from Plaintiff.

136. After a while, Victor stopped responding entirely to Plaintiff.

137. Plaintiff was unable to complete the insurance form satisfactorily.

138. The insurance company proceeded to cancel Plaintiff's insurance, being dissatisfied with the arrangement made by the Dealership.

139. Plaintiff was thereby left without auto insurance and struggled to find a replacement.

140. Plaintiff then realized that his youth, slim credit history and first-time car buyer status all made it impossible for him to obtain auto insurance on his own without misrepresenting the facts to the insurance company.

141. It was then that Plaintiff also realized that the Dealership had provided false or misleading information to the insurance company in order to obtain insurance so that he would proceed with buying the Vehicle.

142. The Dealership knew that if it did not obtain insurance for Plaintiff he could not buy the Vehicle, and so the Dealership misrepresented the facts to the insurance company just so that the sale did not fall through.

143. The Dealership cared only that Plaintiff had insurance long enough to drive the Vehicle out of the Dealership after purchase.

144. With considerable effort, Plaintiff was finally able to secure insurance coverage at the price of $315 per month.

145. This premium was $42 more than the $273 which had already been too high for what Plaintiff could afford to pay.

146. If Plaintiff had known that he would have to pay $315 per month for

insurance, he would not have purchased the Vehicle.

147.    During this same period of time, the Vehicle began to exhibit mechanical defects.

148.    The Vehicle began to stall on the highway and the engine began to shut off abruptly; the Vehicle also swayed and shuddered violently while in operation and even when it was in park; the check engine light illuminated; an airbag warning was displayed: "Supplemental Restraint System Problem. See Your Dealer."

149.    Plaintiff was petrified when the Vehicle would malfunction, even more so as some of the times it shuddered, swayed, stalled and stopped he was driving with his beloved mother in the Vehicle.

150.    Plaintiff arranged for an automotive technician to examine the Vehicle, who thereafter informed Plaintiff that there were signs the Vehicle had been damaged in an accident.

151.    Plaintiff was incredulous at this news since Victor had repeatedly assured him before he bought it that the Vehicle had not been involved in any accident.

152.    The evidence of collision damage included extra gaps between the vehicle panels, misalignment of vehicle panels, unrepaired damage to the vehicle, replaced vehicle panels; the airbag defect; the shuddering and swerving defect; the engine stall and shut off defect.

153.    Plaintiff later obtained a CarFax vehicle history report, which showed that the Vehicle had been involved in at least two crashes in the last three years.

154.    Plaintiff immediately resumed contacting the Dealership to

20

complain, but the few times anyone answered his call he was told that no-one was available who could help him and that someone would call him back.

155.    In those calls Plaintiff requested that the Dealership take back the car because it had been damaged in a collision, contrary to Victor's assurances.

156.    No-one from the Dealership called Plaintiff back.

157.    Plaintiff took the Vehicle for examination to a Honda dealership, where Plaintiff was informed that the Vehicle needed repairs in the amount of $2,159, which did not include the necessary repair to the airbag.

158.    The items of repairs identified by the Honda dealership included but were not limited to: replacement of fuel door actuator; gas door stuck closed service; replace fuel induction service, clean carbon deposits out of system; CVT transmission service; perform cooling system service; power brake fluid exchange, flush entire system, install new fluid; replace car battery; replace cabin air filter, replace windshield wipers; all wheel alignment; replace and balance tires.

159.    The Honda dealership also informed Plaintiff that there was an open, unrepaired safety recall on the Vehicle affecting the performance of the fuel pump motor.

160.    This malfunction made the Vehicle more liable to be involved in a crash.

161.    Honda had informed all dealerships about the recall as early as in February 2024.

162.    Victor did not inform Plaintiff about the unrepaired fuel pump safety recall at any point in time either before or after Plaintiff purchased the Vehicle.

163. Victory Mitsubishi knew of the unrepaired safety recall on the Vehicle before Plaintiff purchased it.

164. Victory Mitsubishi had the means to know of the unrepaired safety recall on the Vehicle before Plaintiff purchased it.

165. Plaintiff would not have purchased the Vehicle had Victory Mitsubishi informed Plaintiff that there was an unrepaired safety recall on the Vehicle.

166. The Honda dealership informed Plaintiff that the recall could not then be repaired because the parts needed for the repair were not yet available.

167. Plaintiff paid $271.19 to the Honda dealership for the examination.

168. Also around this same time, Plaintiff viewed his Lendbuzz account and saw that the loan amount was stated to be $25,384.45.

169. That perplexed Plaintiff, since he knew that his $10,000 down payment should have been deducted from the $25,384.45, thereby making the loan amount only $15,384.45.

170. When Plaintiff inquired of Lendbuzz whether either it or the Dealership was going to give him credit for his $10,000 down payment in order to reduce the loan amount to the agreed $15,384.45, Lendbuzz informed Plaintiff that he had to contact the Dealership.

171. Plaintiff informed Lendbuzz that the Dealership refused to communicate with him but Lendbuzz told him that there was no other way.

172. The most Lendbuzz would do was to send Plaintiff copies of certain loan documents.

173. It was then that Plaintiff saw for the first time that defendants had inserted into the sale costs and charges which he knew nothing about and had not requested.

174. The charges ("Extra Charges") were: GPS tracking for $185; VSI insurance for $335; GAP waiver (insurance) for $595; loan origination fee for $1,145.

175. Plaintiff had neither requested these items nor had he been told he had to purchase them.

176. Plaintiff did not want any of these items, and had he been told about them before he bought the Vehicle, he would not have bought it.

177. To make matters worse, Plaintiff later found out from Lendbuzz that defendants had also inserted into the sale a vehicle service contract ("VSC") at a cost of $3,000, also without Plaintiff's knowledge or consent.

178. No-one had even provided to Plaintiff any documentation concerning the VSC, including the contract itself.

179. To cap it all off, Plaintiff also later found out that defendants had sold him the Vehicle for the price of $27,700, not the $23,124.45 to which Plaintiff and the Dealership had agreed.

180. When Plaintiff again contacted Lendbuzz to complain, Lendbuzz referred Plaintiff to the Dealership for help and told him there was nothing it could do to change the numbers on the loan documents or reduce the loan amount.

181. Plaintiff also informed Lendbuzz about several of the mechanical

defects in the Vehicle, asking Lendbuzz again to take back the Vehicle and unwind the sale due to both the fraud in the paperwork and the defective car.

182.    Predictably, Lendbuzz told Plaintiff "no", that Plaintiff had to contact the Dealership and there was nothing Lendbuzz could do; Plaintiff had to continue to pay the fraudulent loan for the defective Vehicle.

183.    Plaintiff has so far had to spend several hundred dollars on the Vehicle, which includes but is not limited to: purchase spark plugs, coils, a new battery; pay for additional car diagnoses, to name a few.

184.    Plaintiff is frightened to operate the Vehicle except when absolutely necessary and then at slow speeds, which leaves him without personal transportation even though he is paying a monthly car loan payment of almost $500.

185.    Plaintiff came to realize that the Dealership had not provided him with several documents.

186.    The Dealership did not give Plaintiff an MV-50 Certificate of Sale.

187.    The Dealership did not give Plaintiff an Odometer Disclosure Statement.

188.    The Dealership did not give Plaintiff a Damage Disclosure Statement.

189.    The Dealership did not give Plaintiff a Bill of Sale or Invoice.

190.    The Dealership did not give Plaintiff a Buyers Guide for the Vehicle.

191.    The Dealership did not give Plaintiff a New York State Lemon Law Warranty.

192.    The Dealership did not give Plaintiff a New York State Lemon Law Bill of Rights.

193.    The Dealership did not give Plaintiff a New York City Used Car Consumer Bill of Rights.

194.    The Dealership did not give Plaintiff a New York City Used Car Contract Cancellation Option.

195.    The Dealership did not inform Plaintiff about the availability of the Cancellation Option.

196.    The Dealership did not give Plaintiff a New York City Financing Disclosure.

197.    In May 2024, Plaintiff saw online that the 2020 Honda Accord which he had initially seen and which had caused him to visit the Dealership in the first place was still being advertised for sale by the Dealership.

198.    It was then that Plaintiff realized that the Dealership had engaged in "bait and switch" tactics against him.

199.    Due to defendants' aforesaid misconduct, Plaintiff has suffered and continues to suffer loss of money, loss of the value of money, loss of financial opportunity, loss of time, loss of appetite, loss of enjoyment of life, severe distress, loss of concentration, anxiety, worry, stress, aggravation, frustration, helplessness, despair, despondency, and fear which have resulted in pain and suffering to Plaintiff, including but not limited to: loss of sleep, stomach upset, headaches, heartburn, periods of dizziness, nausea, and vomiting.

## AS AND FOR A FIRST CAUSE OF ACTION

TILA–15 U.S.C. § 1638(a)

(Misstatements Of TILA Disclosures)

200.    Plaintiff re-alleges paragraphs 1-199 as if fully re-stated herein.

201.    The amount financed disclosed on the loan contract was $24,054.45 and the loan amount disclosed was $25,384.45.

202.    Defendants fraudulently and deceptively increased the amount financed and loan amount by increasing the cash price of the Vehicle from $23,124 to $27,700 and by adding the Extra Charges and the VSC to the sale.

203.    Plaintiff did not have the actual use of $24,054.45 or $25,384.45.

181.    The RIC materially misstates the amount financed for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(2) and Regulation Z, 12 C.F.R. § 226.17.

182.    The finance charge disclosed on the RIC is $9,839.27.

183.    The finance charge disclosed on the RIC of $9,839.27 does not include the fraudulent price increase, Extra Charges and VSC which Defendants added to the transaction only because Plaintiff purchased the Vehicle on credit and which would not have been added had Plaintiff purchased the Vehicle in an all-cash transaction.

184.    Further, the finance charge disclosed on the RIC of $9,839.27 does not include the fraudulent $3,000 charge for the VSC which Defendants added to the transaction only because Plaintiff purchased the Vehicle on credit and which would not have been added had Plaintiff purchased the Vehicle in an all cash transaction.

185.    The actual finance charge imposed by the RIC includes the hidden and fraudulent amounts for the increased price, the Extra Charges and the VSC, totaling more than $8,000, charged by Defendants incident to the extension of credit.

186.    Therefore, the actual finance charge imposed by the RIC or loan agreement was at least $8,000 more than disclosed.

187.    The RIC therefore materially misstates the finance charge for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z, 12 C.F.R. § 226.17.

188.    The annual percentage rate disclosed on the RIC or loan agreement is 12%.

189.    By 15 U.S.C. § 1638(a)(4), the annual percentage rate is the finance charge expressed as a percentage.

190.    Because the finance charge disclosed on the RIC or loan agreement is materially misstated, the annual percentage rate is also materially misstated.

191.    The actual annual percentage rate imposed by the RIC or loan agreement is substantially greater than the 12% disclosed on the RIC.

192.    The RIC or loan agreement materially misstates the annual

percentage rate for this consumer credit transaction, in violation of 15 U.S.C. §

1638(a)(4) and Regulation Z, 12 C.F.R. § 226.17.

193.    The total of payments disclosed on the RIC or loan agreement is

$33,893.72.

194.    By 15 U.S.C. § 1638(a)(5), the total of payments is the sum of the

amount financed and the finance charge.

195.    Because both the amount financed and the finance charge disclosed

on the RIC or loan agreement are materially misstated, the total of payments is also

materially misstated.

196.    The RIC or loan agreement materially misstates the total of

payments for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(5) and

Regulation Z, 12 C.F.R. § 226.17.

197.    The total sale price disclosed on the RIC or loan agreement is

$33,124.45.

198.    By 15 U.S.C. § 1638(a)(7), the total sale price is the total of the cash

price, additional charges and the finance charge.

199.    Because the cash price and the finance charge disclosed on the RIC

are materially misstated, the total sale price is also materially misstated.

200.    The RIC or loan agreement materially misstates the total sale price

for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(7) and

Regulation Z, 12 C.F.R. § 226.17.

201.    Plaintiff would not have purchased the Vehicle had the imposed

amount financed, finance charge, annual percentage rate, total of payments and total sale price been disclosed to him by defendants.

202.    Defendants are liable to Plaintiff in the amount of twice the finance charge, and for actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640.

203.    Defendants acted willfully and knowingly in their misconduct herein.

<u>AS AND FOR A SECOND CAUSE OF ACTION</u>

TILA–15 U.S.C. § 1638(b)

(Failure To Provide TILA Disclosures Prior To Consummation)

204.    Plaintiff re-alleges paragraphs 1-203 as if fully re-stated herein.

205.    The TILA disclosures were contained in the loan agreement or Disclosure Statement, and nowhere else.

206.     Defendants did not provide Plaintiff with the TILA disclosures before defendants had Plaintiff sign documents.

207.    Defendants obliged Plaintiff to sign documents without first providing to Plaintiff a copy of the TILA disclosures in a form Plaintiff could keep.

208.    In fact, defendants did not even inform Plaintiff of the contents of the documents which they were obliging Plaintiff to sign.

209.    Defendants did not give any document to Plaintiff in a form he could keep, or at all, before they obliged Plaintiff to sign documents.

210.    Defendants failed to give Plaintiff a copy of the required

TILA disclosures in a form he could keep prior to the consummation of the transaction.

211.    Had Defendants provided Plaintiff with a copy of the required

TILA disclosures prior to the consummation of the transaction, Plaintiff would not have

purchased the Vehicle.

212.    Defendants failed to provide Plaintiff with a copy of the

required TILA disclosures in a form he could keep, or at all, prior to the consummation of

the transaction, in violation of 15 U.S.C. § 1638(b) and Regulation Z, 12 C.F.R. §

226.17(b).

213.    Defendants are liable to Plaintiff in the amount of twice the

finance charge, and for actual damages and reasonable attorneys' fees, costs and

disbursements in accordance with 15 U.S.C. § 1640.

214.    Defendants acted willfully and knowingly in their misconduct

herein.

<u>ALLEGATIONS AGAINST BOTH DEFENDANTS</u>

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>

EFTA, 15 U.S.C. § 1693

215.    Plaintiff re-alleges paragraphs 1-214 as if fully re-stated herein.

216.    In contravention of the EFTA and 12 C.F.R. § 205.10(e), the

Dealership obliged Plaintiff to pay his loan by auto pay in order to approve him for

credit.

217.    In contravention of the EFTA and 12 C.F.R. § 205.10(e), Lendbuzz obliged Plaintiff to pay his loan by auto pay in order to approve him for credit.

218.    Plaintiff is therefore entitled to damages against the Dealership under the EFTA and implementing regulations.

219.    Plaintiff is therefore entitled to damages against Lendbuzz under the EFTA and implementing regulations.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>

MMWA, 15 U.S.C. § 2301, NYVTL § 417

(False Certification Of Serviceability)

220.    Plaintiff re-alleges paragraphs 1-219 as if fully re-stated herein

221.    nPlaintiff is a "consumer" within the meaning of the MMWA, 15 U.S.C. § 2301 *et seq*.

222.    The Dealership is a "supplier" within the meaning of the MMWA.

223.    The Dealership is a "warrantor" within the meaning of the MMWA.

224.    The Vehicle is a "consumer product" within the meaning of the MMWA.

225.    Before it sold the Vehicle to Plaintiff, the Dealership was required to inspect the Vehicle and correct as necessary to ensure that the Vehicle was roadworthy.

226.    Only after performing the inspection and corrections could the

Dealership provide the certification specified in New York Vehicle and Traffic Law ("NYVTL") § 417 and 15 NYCRR 78.13(b).

227.    The certification specified in NYVTL § 417 and 15 NYCRR 78.13(b) is a statement that "[i]f this motor vehicle is classified as a used motor vehicle, the dealer named above certifies that the entire vehicle is in condition and repair to render, under normal use, satisfactory and adequate service upon the public highway at the time of delivery."

228.    Therefore, the Dealership was required by NYVTL§ 417 to ensure that the *entire* Vehicle was roadworthy.

229.    The certification required by NYVTL § 417 is a warranty of serviceability, is non-waivable and is implied in a dealer's sale of every used vehicle.

230.    The Dealership did not inspect the Vehicle or correct the defects in the Vehicle, as afore-listed, which rendered the Vehicle unserviceable prior to delivery of the Vehicle to Plaintiff.

231.    The Dealership did not make an appropriate safety inspection of the Vehicle prior to delivering the Vehicle to Plaintiff.

232.    The Dealership did not deliver a roadworthy vehicle to Plaintiff.

233.    The Dealership did not correct the defects before delivery of the Vehicle to Plaintiff, in violation of the warranty of serviceability under NYVTL § 417 and 15 NYCRR 78.13(b).

234.    The warranty of serviceability is a warranty implied by New York

State law, NYVTL § 417 and 15 NYCRR 78.13(b) and is an "implied warranty" within the meaning of the MMWA.

235.    The warranty of serviceability is also an express written warranty in Plaintiff's purchase of the Vehicle, in that it is required to be contained in the bill of sale or invoice and the purchase agreement (neither of which the Dealership provided to Plaintiff on March 30, 2024) and is a "written warranty" within the meaning of the MMWA.

236.    In violating the warranty of serviceability, Defendants violated the MMWA, 15 U.S.C. § 2301 *et seq*.

237.    Lendbuzz is liable to Plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

238.    Defendants are jointly and severally liable to Plaintiff for actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 2310(d).

<u>AS AND FOR A FIFTH CAUSE OF ACTION</u>

COMMON-LAW FRAUD

239.    Plaintiff re-alleges paragraphs 1-238 as if fully re-stated herein.

**<u>Fraudulent Representation As To Condition Of Vehicle And Accident-Free</u>**.

240.    On March 30, 2024, before Plaintiff purchased the Vehicle, the Dealership, through its representative Victor represented to Plaintiff that the Dealership had recently inspected the Vehicle, the Vehicle was in good working condition, had no mechanical problem and drove well.

241. In addition, the Dealership represented to Plaintiff that the Vehicle had not been involved in an accident.

242. By the sale and delivery of the Vehicle to Plaintiff, the Dealership certified that "the entire vehicle was in condition and repair to render, under normal use, satisfactory and adequate service upon the public highway at the time of delivery."

243. This certification of roadworthiness constitutes the implied, non-waivable warranty of serviceability.

244. On the contrary, as alleged more fully above, the Vehicle was and remains fundamentally defective.

245. Normal operation of the Vehicle endangered and endangers Plaintiff and other road users.

246. The representation of the Dealership that it would deliver to Plaintiff a roadworthy vehicle was a material fact of Plaintiff's purchase of the Vehicle.

247. The representation of the Dealership that the Vehicle had not been involved in any accident was a material fact of Plaintiff's purchase of the Vehicle.

248. These representations were false at the time they were made by the Dealership.

249. The Dealership knew these representations were false at the time they were made by the Dealership.

250. The representations were made by the Dealership for the purpose of inducing Plaintiff to rely on them and to decide to purchase the Vehicle.

251. At the time the Dealership made the representations to Plaintiff,

Plaintiff did not know and had no reason or means to know that the representations were false.

252.    Plaintiff did reasonably, justifiably and rightfully rely on the representations of the Dealership in deciding to purchase the Vehicle.

253.    Plaintiff's decision to purchase the Vehicle was based on the representations of the Dealership.

254.    Plaintiff would not have purchased the Vehicle had he known that the Vehicle was not roadworthy or had been involved in no fewer than two accidents.

255.    As more fully alleged above, Plaintiff was gravely damaged by the false representations of the Dealership.

256.    Defendants are jointly and severally liable to Plaintiff for the fraud detailed herein.

257.    Lendbuzz is liable to Plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

258.    Defendants are jointly and severally liable to Plaintiff for actual, compensatory and punitive damages in an amount to be determined at the time of trial.

**Fraudulent Price Increase**

259.    Through their representative Victor, Defendants represented to Plaintiff before Plaintiff purchased the Vehicle that Defendants would sell Plaintiff the Vehicle for total cash sale price $25,384.45.

260.    Defendants in fact sold Plaintiff the Vehicle for $33,124.45.

261.    The representation of Defendants that it would sell Plaintiff the

Vehicle for $25,384.45 was a material fact of Plaintiff's purchase of the Vehicle.

262.    This representation was false at the time it was made by Defendants

263.    Defendants knew this representation was false at the time it was made by Defendants.

264.    The representation was made by Defendants for the purpose of inducing Plaintiff to rely on it and to decide to purchase the Vehicle.

265.    At the time Defendants made the representation to Plaintiff, Plaintiff did not know and had no reason or means to know that the representation was false.

266.    Plaintiff did reasonably, justifiably and rightfully rely on the representation of Defendants as to the price of $25,384.45 in deciding to purchase the Vehicle.

267.    Plaintiff's decision to purchase the Vehicle was based on this representation of Defendants that the price of the Vehicle was $25,384.45.

268.    Plaintiff would not have purchased the Vehicle had he known that Defendants would increase the price of the Vehicle by more than $8,000.

269.    Plaintiff was gravely damaged by the false representation of Defendants.

270.    Defendants are jointly and severally liable to Plaintiff for the fraud detailed herein.

271.    Lendbuzz is liable to Plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

272.    Defendants are jointly and severally liable to Plaintiff for actual, compensatory and punitive damages in an amount to be determined at the time of trial.

**Rescission, Restitution And Punitive Damages**

273.    At his option, Plaintiff is entitled to rescission of the retail installment contract due to defendants' fraud, and restitution damages.

274.    In addition or in the alternative, Plaintiff is entitled to punitive damages in that defendants' aforesaid fraudulent conduct evinces bad faith, was wanton and malicious, outrageous and unconscionable, and was undertaken with intent to harm Plaintiff or was so grossly negligent or reckless as to evince utter disregard for the legal rights of Plaintiff, entitling Plaintiff to punitive damages against defendants. At all material times, defendants' fraudulent conduct was not aimed and practiced against Plaintiff only, but was aimed and practiced against other members of the public who purchased an automobile, as can be seen from the Attorney General's enforcement action against the Dealership for the same misconduct which it perpetrated against Plaintiff. In addition, Plaintiff knows of several other persons against whom the Dealership has committed the same violations as the violations which it committed against Plaintiff. Further, there are hundreds of reviews from car buyers and would-be car buyers on various online fora also complaining about the Dealership's said misconduct.

AS AND FOR A SIXH CAUSE OF ACTION

NYGBL § 349–Deceptive Acts And Practices

275.    Plaintiff re-alleges paragraphs 1-274 as if fully re-stated herein.

276.    Defendants owed a duty to Plaintiff to transact business with Plaintiff with reasonable care.

277.    Defendants breached said duty.

278.    On March 30, 2024, Defendants breached said duty by: (i) preparing a fraudulent RIC or loan agreement and note; (ii) deceptively selling to Plaintiff the Vehicle at a price in excess of the advertised price; (iii) deceptively selling to Plaintiff the Vehicle at a price in excess of the agreed price; (iv) deceptively adding a vehicle service contract to Plaintiff's purchase; (v) failing to provide to Plaintiff a Certificate of Sale; (vi) failing to provide to Plaintiff an Odometer and Damage Disclosure Statement; (vii) failing to provide to Plaintiff a Bill of Sale or Invoice; (viii) failing to display a Buyers Guide on the Vehicle while offering the Vehicle for sale or for inspection by a consumer, in contravention of the Federal Trade Commission Used Car Rule and the MMWA; (ix) failing to provide to Plaintiff a Buyers Guide; (x) failing to provide to Plaintiff a New York State Lemon Law Warranty; (xi) failing to provide to Plaintiff a New York State Lemon Law Bill of Rights; (xii) failing to provide to Plaintiff a New York City Used Car Consumer Bill of Rights; (xiii) failing to provide to Plaintiff a New York City Used Car Contract Cancellation Option; (xiv) failing to provide to Plaintiff a New York City Financing Disclosure; (xv) deceptively including a VSC into Plaintiff's purchase; (xvi) failing to include the VSC into the itemization of the amount financed disclosure; (xvii) deceptively obliging Plaintiff to pay his auto loan by autopay debit from his deposit account; (xviii) deceptively preparing a loan agreement and note

instead of the proper retail installment contract; (xix) deceptively engaging in insurance

fraud in relation to Plaintiff; (xx) engaging in bait and switch tactics against Plaintiff.

279.    Defendants' said acts and practices are deceptive on their

face.

280.    Defendants' deceptive acts and practices were committed by

Defendants in the conduct of a business, trade or commerce or the furnishing of a service

within the State of New York and constitutes a violation of NYGBL § 349.

281.    Defendants' deceptive acts and practice were consumer-

oriented.

282.    Defendants' deceptive acts and practices were consumer-

oriented in that Defendants' aforesaid misconduct in its business practices was not

limited to Plaintiff but extended to Defendants' practices with other consumers within the

State of New York.

283.    Indeed, many other consumers, such as Brenda N***, have been

similarly victimized by the Dealership.

284.    Defendants' acts and practices are recurring and directed at

the public at large and said acts and practices are the sort that do easily recur, do impact

similarly-situated consumers, and are therefore consumer-oriented.

285.    For example, the Attorney General's enforcement action against

the Dealership, described above, was meant to curb the same fraudulent and deceptive

practices which the Dealership perpetrated against Plaintiff.

286.    In addition, Plaintiff knows of several other persons whom the

Dealership has deceived in the same manner as the Dealership has deceived him.

287.    In addition, various online fora and spaces are replete with negative customer reviews about the Dealership's commission of the same violations as the violations it committed against Plaintiff.

288.    The Dealership's acts and practices have a broader impact on consumers at large who purchase automobiles from the Dealership.

289.    The Dealership's aforesaid acts and practices are deceptive in a material way.

290.    Plaintiff has been injured as a result of the Dealership's misconduct, as described more fully above.

291.    Defendants have improperly profited from their deceptive acts and practices and have retained said profits.

292.    Plaintiff is a reasonable consumer within the meaning of the NYGBL and acted reasonably under the circumstances of this case.

293.    Defendants violated NYGBL § 349(a) and is liable to Plaintiff under NYGBL § 349(h).

294.    Defendants acted willfully and knowingly in their deceptive misconduct herein.

295.    As a result of the above violations, Plaintiff seeks injunctive relief against Defendants and Defendants is liable to Plaintiff for actual, compensatory, treble and punitive damages in an amount to be determined at the time of trial, and reasonable attorneys' fees, costs and disbursements.

296.    Lendbuzz is liable to Plaintiff pursuant to the "Holder Rule", 16

C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

297.    Defendants are jointly and severally liable to Plaintiff for violation

of NYGBL § 349.

298.    Defendants are jointly and severally liable to Plaintiff for actual,

compensatory and punitive damages in an amount to be determined at the time of trial.

<u>AS AND FOR A SEVENTH CAUSE OF ACTION</u>

CONVERSION

299.    Plaintiff re-alleges paragraphs 1-298 as if fully re-stated herein.

300.    Plaintiff paid $10,000 to Defendants as down payment for the

purchase of the Vehicle.

301.    When Plaintiff validly revoked his acceptance of the Vehicle and

requested return of his down payment, Plaintiff held an ownership and a possessory

interest in the $10,000 superior to Defendants' interest.

302.    Plaintiff demanded the return of the $10,000 from Defendants

no later than July 2024.

303.    Defendants refused, failed and neglected to return the $10,000

to Plaintiff.

304.    By their refusal, failure and neglect to return the $10,000 to Plaintiff

Defendants intentionally and without authority assumed and exercised dominion and

control over the $10,000 in derogation of Plaintiff's superior rights.

305.    Even if Defendants' possession of the $10,000 were initially lawful, said possession became unlawful when Defendants refused, failed and neglected to heed Plaintiff's repeated demands for the return of the $10,000, as aforesaid.

306.    Defendants' improper retention of the $10,000 unlawfully interfered with Plaintiff's rights to dominion and control over the $10,000 and constitutes conversion.

307.    Defendants' conversion of the $10,000 caused Plaintiff financial loss and emotional harm, as alleged above.

308.    As a retail car dealer, Defendants should have known that they had no lawful right to retain the $10,000.

309.    Defendants's conversion of the $10,000 was therefore gross, wanton and deliberate and demonstrates a high degree of moral culpability so flagrant as to transcend mere carelessness, and constitutes willful and wanton negligence or recklessness so as to justify an award of punitive damages.

310.    Plaintiff is entitled to an award of punitive damages against Bay Ridge Volvo for conversion, in addition to actual and compensatory damages.

311.    Defendants acted willfully and knowingly in its misconduct.

312.    Lendbuzz is liable to Plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 Rule" and its New York state analog, New York Personal Property Law § 302(9).

313.    Defendants are jointly and severally liable to Plaintiff for conversion.

<u>ALLEGATIONS AGAINST LENDBUZZ DIRECTLY.</u>

<u>AS AND FOR A EIGHTH CAUSE OF ACTION</u>

NYGBL § 349–Deceptive Acts And Practices

314.    Plaintiff re-alleges paragraphs 1-313 as if fully re-stated herein.

315.    Lendbuzz owed a duty to Plaintiff to transact business with Plaintiff with reasonable care.

316.    Lendbuzz breached said duty to Plaintiff.

317.    Lendbuzz also had a duty to Plaintiff pursuant to the federal and state "Holder Rules".

318.    Lendbuzz breached each said duty to Plaintiff.

319.    Pursuant to the "Holder Rule", 16 C.F.R. 433.2: "[a]ny holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof."

320.    Pursuant to New York State's analog of the Holder Rule, New York Personal Property Law § 302(9): "[t]he assignee of a retail installment contract or obligation shall be subject to all claims and defenses of the buyer against the seller arising from the sale notwithstanding any agreement to the contrary."

321.    Pursuant to the Holder Rules, Lendbuzz was subject to and responsible for all the same claims and defenses which Plaintiff held against Defendants for its fraudulent, deceptive and unlawful conduct.

322.    As alleged more fully above, Lendbuzz did not investigate any of Plaintiff's complaints concerning the Dealership but told Plaintiff that it could not assist Plaintiff, that Plaintiff had to contact the Dealership and that Plaintiff had to continue to pay the fraudulent loan.

323.    Lendbuzz's said acts and practices are deceptive on their face.

324.    Lendbuzz's deceptive acts and practices were committed by Lendbuzz in the conduct of a business, trade or commerce or the furnishing of a service within the State of New York and constitutes a violation of NYGBL § 349.

325.    Lendbuzz's deceptive acts and practices were consumer-oriented.

326.    Lendbuzz's deceptive acts and practices were consumer-oriented in that Lendbuzz's aforesaid misconduct in its business practices was not limited to Plaintiff but extended to Lendbuzz's practices with other consumers within the State of New York.

327.    Lendbuzz's deceptive acts and practices are recurring and directed at the public at large and said acts and practices are the sort that do easily recur, do impact similarly-situated consumers, and are therefore consumer-oriented.

328.    Lendbuzz's aforesaid deceptive acts and practices therefore have a broader impact on consumers at large.

329.    Lendbuzz's aforesaid acts and practices are deceptive in a material way.

330.    Plaintiff has been injured as a result of Lendbuzz's misconduct, as more fully alleged above.

331.    Lendbuzz has improperly profited from its deceptive acts and practices and has retained said profits.

332.    Plaintiff is a reasonable consumer within the meaning of the NYGBL and acted reasonably under the circumstances of this case.

333.    Lendbuzz violated NYGBL § 349(a) and is liable to Plaintiff under the NYGBL § 349(h).

334.    Lendbuzz acted willfully and knowingly in its deceptive misconduct herein.

335.    As a result of the above violations, Plaintiff seeks injunctive relief against Lendbuzz and Lendbuzz is liable to Plaintiff for actual, compensatory, treble and punitive damages in an amount to be determined at the time of trial, and reasonable attorneys' fees, costs and disbursements.

WHEREFORE, Plaintiff respectfully prays that judgment be entered against defendants as follows:

(a)    at Plaintiff's option, rescinding the retail installment contract or loan agreement and note due to fraud and forgery and for restitution damages for all monies paid under and by reason of said contract;

(b)    awarding twice the finance charge, actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640 as against Defendants;

(c)    awarding actual damages and reasonable attorneys' fees, costs and

disbursements in accordance with 15 U.S.C. § 2310;

(d)     awarding actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1693;

(e)     awarding actual damages and reasonable attorneys' fees, costs and disbursements pursuant to NYVTL § 417 and the regulations thereunder;

(f)     awarding actual, compensatory and punitive damages for common-law fraud in an amount to be determined at the time of trial;

(g)     enjoining each defendant from committing further deceptive acts and practices towards Plaintiff, pursuant to NYGBL § 349;

(h)     awarding actual damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(i)     in the alternative to (g), awarding statutory damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(j)     awarding treble damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(k)     awarding punitive damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(l)     awarding reasonable attorneys' fees, costs and disbursements pursuant to NYGBL § 349(h);

(m)    awarding actual, compensatory and punitive damages for

conversion;

(n)     awarding pre-judgment interest; and

(o)     for such other and further relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury on all issues so triable.

Dated: New York, New York
      July 2, 2025.

                                                    */s/  Novlette R. Kidd*
                                                   NOVLETTE R. KIDD, ESQ. (NK 9339)
                                                   KIDD LAW GROUP PLLC
      Attorneys for Plaintiff
      450 Seventh Avenue, Suite 704
      New York, New York 10123
      Tel.: 917.340.1635
      Nkidd@kiddlawgroup.com