UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VIVIAN MCLEAN,

                            Plaintiff,

            -v-

LENDBUZZ FUNDING LLC, *et al.*,

                            Defendants.

25-CV-2679 (JPO)

MEMORANDUM AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Vivian McLean brings this action against Defendants Spartan Auto Group LLC, and Victoria Auto Group LLC (collectively, "Victory Mitsubishi") and Lendbuzz Funding LLC ("Lendbuzz").  Before this Court are three motions: Lendbuzz's motion to compel arbitration (ECF No. 47), Victory Mitsubishi's motion to dismiss (ECF No. 59), and McLean's motion to strike (ECF No. 73).  For the reasons that follow, the motion to compel and motion to dismiss are granted, and McLean's motion to strike is denied as moot.

I.      **Background**

        A.      **Factual Background**

The following facts are drawn from McLean's first amended complaint (ECF No. 40 ("FAC")) and are assumed true for the purposes of this motion.  *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).  On March 30, 2025, McLean purchased as 2019 Honda Accord (VIN: 1HGCV1F11KA052191) (the "Vehicle") from Victory Mitsubishi in the Bronx, New York.  (FAC ¶¶ 71, 86, 97.)  Although McLean did not test drive the Vehicle (*id.* ¶ 87), McLean asked Victory Mitsubishi salesman Victor if the Vehicle had not been involved in any accident, and Victor assured McLean that it had not (*id.* ¶¶ 91, 92).

1

Based on the belief that the Vehicle was in good working condition, had no mechanical problems, and drove well, McLean agreed to purchase the Vehicle for a price of $25,384.45, after fees and charges. (*Id*. ¶¶ 95, 97, 99.) McLean made a down payment of $10,000 to Victory Mitsubishi. (*Id*. ¶ 101.) Victor assured McLean that the $10,000 would be subtracted from the $25,384.45 total price, and therefore, that McLean's car loan would be no more than $15,384.45. (*Id*. ¶ 103.)

As this was McLean's first time buying a car, he did not have existing car insurance. (*Id*. ¶ 106.) Victor assured McLean that he could obtain car insurance for him for a premium of $273 per month for six months. (*Id*. ¶ 112.) However, Victor did not show or tell McLean what information or documents Victor would provide to the insurance company. (*Id*. ¶ 109.) Victor then arranged with the insurance company McLean's auto insurance. (*Id*. ¶ 110.) After a few hours, Victor told McLean that he had obtained the insurance at the promised premium, and McLean signed and initialed relevant documents. (*Id*. ¶¶ 112, 114.) According to McLean, Victor did not allow McLean to read the documents that he signed; instead, Victor used one hand to cover up the text on each page. (*Id*. ¶ 114.)

Victor informed McLean that Victory Mitsubishi had obtained Lendbuzz, a finance company, for McLean's car loan, and requested that McLean give Victor his bank account number and bank routing number so that the loan payments could be automatically deducted from McLean's account for autopay. (*Id*. ¶¶ 112, 116, 122.) McLean complied. (*Id*. ¶ 125.) The FAC seems to allege that McLean signed no agreement with Lendbuzz, but rather that he gave Victor his information and Victor forged his signature. (*Id*.; ECF No. 67 at 15.) The Vehicle was delivered to McLean that same night. (*Id*. ¶ 131.)

Shortly after McLean's purchase of the Vehicle, in or around April 2024, the insurance company cancelled McLean's auto insurance, as McLean did "was unable to complete" an insurance form "satisfactorily." (*Id.* ¶¶ 137, 138.)  During this same period, the Vehicle started to exhibit mechanical defects. (*Id.* ¶ 147.)  McLean was informed by an automotive technician that there were signs the Vehicle had been damaged in an accident. (*Id.* ¶ 150.)  McLean then obtained a CarFax report which revealed the Vehicle had been involved in at least two crashes in the last three years. (*Id.* ¶ 153.)  McLean also learned that there was an open, unrepaired safety recall on the Vehicle affecting the performance of the fuel pump motor. (*Id.* ¶ 159.)

Around this same time, McLean discovered that his Lendbuzz loan amount was stated to be $25,384.45, which allegedly did not reflect the $10,000 down payment that McLean had paid toward the Vehicle price. (*Id.* ¶¶ 168-70.)  Even more, McLean alleges that Victory Mitsubishi deceptively sold him the Vehicle for $27,700, which included extra charges to his loan to which McLean had not consented. (*Id.* ¶¶ 173-79.)

McLean now brings this action seeking rescission of the Vehicle sale contract and restitution damages due to fraud; damages against defendants pursuant to the federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; damages against both defendants pursuant to the Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.*; damages against both defendants pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, as well as pursuant to the New York Vehicle and Traffic Law § 417, 15 NYCRR 78.13(c) and 15 NYCRR 79.2; injunctive relief and damages against both defendants pursuant to New York General Business Law; damages against both defendants for common-law fraud; damages against both defendants for conversion; and damages against Lendbuzz pursuant to NYGBL § 349 for deceptive acts and practices. (*Id.* ¶ 14.)

### B.    Procedural Background

McLean filed his initial complaint against Victory Mitsubishi and Lendbuzz on March 31, 2025.  (ECF No. 1.)  Lendbuzz filed its initial motion to compel arbitration of all claims against it on May 30, 2025.  (ECF No. 19.)  Victory Mitsubishi filed a motion to dismiss on June 5, 2025.  (ECF No. 22.)  On June 20, 2025, McLean requested that this Court grant him leave to amend his complaint (ECF No. 32), which the Court granted (ECF No. 34).  On July 2, 2025, McLean filed the operative complaint (the "FAC").  (*See generally* FAC.)  On July 16, 2025, Lendbuzz again filed a motion to compel arbitration (ECF No. 47) and accompanying memorandum of law (ECF No. 49 ("Mtn. to Comp.")).  McLean opposed Lendbuzz's motion to compel on August 7, 2025. (ECF No. 56.)  Lendbuzz filed reply in further support on August 14, 2025. (ECF No. 62.)

Victory Mitsubishi filed its second motion to dismiss (ECF No. 59) and accompanying memorandum of law (ECF No. 60) on August 13, 2025.  McLean opposed on September 29, 2025 (ECF No. 67), and Victory Mitsubishi filed a reply in further support on October 18, 2025 (ECF No. 71.)  On November 1, 2025, McLean then filed a motion to strike Victory Mitsubishi's reply memorandum, as Victory Mitsubishi did not receive permission from the Court to file an oversized brief.  (ECF No. 73.)  Victory Mitsubishi opposed the motion to strike on November 17, 2025, (ECF No. 74), and McLean filed a memorandum in further support of its motion to strike on November 24, 2025 (ECF No. 76).[1]

## II.    Discussion

---

[1] Because the Court does not rely on Victory Mitsubishi's reply memorandum in this ruling, McLean's motion to strike is denied as moot.  *See, e.g., Serafin v. Kahane*, No. 16-2499, 2016 WL 9411240, at *1 (2d Cir. Nov. 15, 2016) (summary order) (denying Appellants' motion to strike as moot "since the Court has not relied on the challenged portion of the Appellee's reply in reaching this decision").

A.    **Lendbuzz's Motion to Compel Arbitration**

Lendbuzz and McLean agree that the Loan Agreement contained an arbitration clause within it on which Lendbuzz relies for its motion to compel arbitration.  (ECF No. 49 at 1; ECF No. 56 at 2.)  The Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*. ("FAA") provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  The FAA thus reflects a "federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks omitted).

"In deciding whether to compel arbitration, a court must first decide whether the parties agreed to arbitrate."  *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022).  When determining whether an agreement to arbitrate is valid, "the general rule is that courts should apply ordinary state-law principles that govern the formation of contracts."  *T.Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 344 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) ("Whether or not the parties have agreed to arbitrate is a question of state contract law.").  Accordingly, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements."  *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

The Court undertakes this analysis by considering all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the nonmoving party.  *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017); *Nicosia v.*

*Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). This standard is "similar to that applicable for a motion for summary judgment." *Meyer*, 868 F.3d at 74 (internal quotation marks omitted).

### 1.     Agreement to Arbitrate

The party seeking to compel arbitration "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman*, 49 F.4th at 101-02. "This burden does not require the moving party to show that the agreement would be enforceable—only that an agreement to arbitrate existed." *Id.* at 102. Whether such an agreement existed is a question of applicable state contract law. *Id.* at 101.

As an initial matter, the parties dispute whether New York or Connecticut law applies to the Loan Agreement. (ECF No. 48-3.) The Loan Agreement states that the "provisions of this Agreement will be governed by (a) federal laws and regulations and (b) the laws of the state or jurisdiction where you resided at the time you signed this Agreement." (ECF No. 48-3 at 7.) At the time of his purchase of the car, McLean resided in Connecticut. McLean argues, however, that "New York law, and not that of Connecticut, is the appropriate law, since [McLean] did not transact with Lendbuzz at the date of the purchase of the Vehicle." (ECF No. 56 at 5.)

Ultimately, the choice-of-law provision in the Loan Agreement does not "resolve the contract formation issue" because doing so "would presume the applicability of a[n agreement] before its adoption by the parties has been established." *Schnabel*, 697 F.3d at 119. Like other contracts, the issue of an arbitration agreement's formation is "governed by the choice-of-law doctrine of the forum state, here, New York." *Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 46 (E.D.N.Y. 2017); *see also Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 590 n.7 (S.D.N.Y. 2001). But "if the relevant states' laws do not conflict, a choice of law analysis is unnecessary and the court may apply the forum state's law." 19 Wright & Miller, Federal

Practice and Procedure § 4506 (3d ed. 2016); *see also Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993) ("The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.").  Second Circuit law indicates that contract formation principles under New York and Connecticut law bear substantial similarities.  *Havens v. Hartford Financial Serv's Grp., Inc.*, No. 18-CV-488, 2020 WL 1244235, at *6 (S.D.N.Y. Mar. 13, 2020) (comparing *Meyer*, 868 F.3d at 74 with *Schnabel*, 697 F.3d at 119).  Considering the substantial similarity between New York and Connecticut law on the issue of contract formation, this Court "need not resolve this thorny choice-of-law question," as "which state's law applies is ultimately without significance."  *Id.* (brackets omitted) (quoting *Schnabel*, 697 F.3d at 119).

McLean requests recission of the Loan Agreement "due to fraud and forgery" (*see* FAC ¶ 335), which would void the Loan Agreement and included Arbitration Clause under both New York and Connecticut law.  *See Zambia Nat'l Commercial Bank Ltd. v. Fidelity Int'l Bank*, 855 F. Supp. 1377, 1386 (S.D.N.Y. 1994); *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 370 (2d Cir. 2003) ("Under New York State law and general contract law, a forged signature renders a contract void *ab initio*." (cleaned up)); *Flagstar Bank, FSB v. Ticor Title Ins. Co.*, 660 F. Supp. 2d 346, 350 (D. Conn. 2009) (articulating the "well-formulated principle that fraud vitiates all contracts, written or otherwise" (cleaned up)).

However, "[b]oth void and voidable contracts and instruments may be ratified." *John Hancock Life Ins. Co. of New York v. Solomon Baum Irrevocable Fam. Life Ins. Tr.*, 357 F. Supp. 3d 209, 218 (E.D.N.Y. 2018) (citing New York law), *aff'd*, 783 F. App'x 89 (2d Cir. 2019).  Thus, even when the original contract may be void for forgery, courts can still consider whether there is a subsequent manifestation of assent to constitute ratification.  *See e.g. RLI Ins.*

*Co. v. Athan Contracting Corp.*, 667 Fed. Supp. 2d 229, 236-37 (E.D.N.Y. 2009) (citing New York law); *Short v. Alpine Motors Inc.*, No. 24-CV-4451, 2025 WL 2933105, at *5 (E.D.N.Y. Aug. 6, 2025) ("Plaintiff, upon learning of the forgery, returned the vehicle, manifesting an intent to rescind the agreement, and did not . . . ratify the forged agreement. Thus . . . [unlike] where [a] plaintiff continued to make payments pursuant to the [agreement], Plaintiff here rescinded the agreement by returning the vehicle."), *report and recommendation adopted in part, rejected in part*, No. 24-CV-4451, 2025 WL 2680117 (E.D.N.Y. Sept. 19, 2025).

A party may ratify a contract by "intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122-23 (2d Cir. 2001) (quotation marks omitted). "Acceptance and retention of the goods constitutes ratification of the agreement between the parties." *Nat'l City Com. Cap. Co., LLC v. Becker Real Est. Servs., Inc.*, 885 N.Y.S.2d 173, 177 (Sup. Ct. 2009). This principle extends to terms of a contract which the party did not read if the party was on inquiry notice of the terms. *See Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 548 (S.D.N.Y. 2018). A party is on inquiry notice if a "reasonably prudent" party "would have noticed . . . and reviewed the terms." *Whitt v. Prosper Funding LLC*, No. 15-CV-136, 2015 WL 4254062, at *5 (S.D.N.Y. July 14, 2015) (quotation marks omitted).

In this case, McLean's failure to repudiate the contract constitutes ratification. McLean had adequate notice of the Arbitration Clause. Lendbuzz's automatically generated email sent to McLean's email provided McLean with a link to the customer portal, which included access to a copy of the loan documents, including the Loan Agreement and Arbitration Clause therein.

8

(ECF No. 48 ¶ 6(e).)[2]  Lendbuzz business records show that McLean opened Lendbuzz's emails, including its April 2, 2025 email, which "reiterated the terms of the Loan [Agreement] and informed [McLean] that Lendbuzz paid the proceeds of the Loan to Victory Mitsubishi."  (ECF No. 49 at 1-2; *see also* ECF No. 48 ¶ 24); *see Glover v. Bob's Discount Furniture LLC*, 621 F. Supp. 3d 442, 448 (S.D.N.Y. 2022) (concluding that when the back of the receipt includes an arbitration provision, a party may still be bound even when she did not sign the receipt when she had adequate notice).  The Loan Agreement itself includes a large, bolded box with the words: **"ARBITRATION CLAUSE – PLEASE READ CAREFULLY"**.  (ECF No. 48-3 at 10-12.)

McLean then accepted the car without protest and continued to pay off his car loan to Lendbuzz for thirteen months.  (*See generally* ECF No. 48-1.)  McLean's acquiescence resembles the plaintiff's acquiescence in *Islam v. Lee's Motors, Inc.*, in which the plaintiff continued to make monthly payments on his car and maintained possession of the car despite

---

[2] McLean requests that this Court strike or disregard the declaration of Timothy Corcoran and the included business records.  (ECF No. 56 at 11.)  Corcoran's declaration lays a sufficient foundation for his knowledge of the facts to which he attests.  Corcoran provides his job titles at Lendbuzz, including Unwriting Product Expert, Credit Officer, and Senior Loan Officer, and states that through these roles he is familiar with Lendbuzz's loan origination process.  (ECF No. 48 ¶¶ 2, 3.)  "[T]he personal knowledge of a witness may be inferred based on her position with a company." *Borukh v. Experian Info. Sols., Inc.*, No. 24-CV-6022, 2025 WL 1220042, at *5 (E.D.N.Y. Apr. 28, 2025).  In a similar vein, "[i]t is axiomatic that a corporate representative may testify . . . based on knowledge gained from a review of corporate books and records." *Boniel v. U.S. Bank N.A.*, No. 12-CV-3809, 2013 WL 1687709, at *1 (E.D.N.Y. Apr. 18, 2013) (quotation marks omitted); *Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016) (same); *see also Borukh*, 2025 WL 1220042, at *6 ("[A] witness may establish personal knowledge based on a review of business records.").  In his declaration, Corcoran explains the steps in Lendbuzz's regularly conducted business activity of making direct auto loans, how the information created and/or reflected in the record is regularly obtained, how Lendbuzz regularly maintains the record, and how that process played out as to McLean's Agreement.  (ECF No. 48 ¶¶ 6, 11, 19, 21, 24); *U.S. v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014) ("To lay a proper foundation for a business record, a custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the record." (cleaned up)).  Accordingly, McLean's request to strike this evidence is denied.

allegedly not signing the retail installment contract with the car dealership.  2018 WL 4771884, at *5 (E.D.N.Y. Sep. 30, 2018).  There, the court concluded that the parties' actions were consistent with an agreement and acknowledged the existence of an agreement under which they were bound.  *Id.*  So too here are McLean's actions consistent with a binding Loan Agreement.

In this case, McLean's consistent payments on the loan indicated assent to the terms of the Loan Agreement, which included in bolded, underlined headings an Arbitration Clause referring to ta mandatory arbitration procedure.[3]  Ultimately, because McLean had adequate notice of the arbitration clause, his "failure to repudiate the contract constitutes acceptance of the arbitration clause."  *Glover*, 621 F. Supp. 3d at 449; *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Oliver*, No. 15-CV-4971, 2016 WL 344980, at *3 n.1 (S.D.N.Y. Jan. 27, 2016); *DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 633-34 (2d Cir. 1982) (holding that a party who has failed to promptly repudiate a contract will be deemed to have waived that right).

### 2.    Unconscionability

Having concluded that there is an arbitration agreement, the Court analyzes its conscionability pursuant to Connecticut law, as McLean resided in Connecticut when he entered into the contract.  (*See* ECF No. 49 ¶¶ 20-21; ECF No. 48-3 § 14 ("The provisions of this Agreement will be governed by (a) federal laws and regulations and (b) the laws of the state or jurisdiction where you resided at the time you signed this Agreement.").)  Under Connecticut

---

[3] McLean also argues that absent a Lendbuzz signature, the Loan Agreement is not enforceable.  (ECF No. 56 at 13.)  McLean cites no case that espouses such a holding, and the weight of case law supports finding in the contrary.  *See National City Golf Fin. v. Higher Ground Cnty. Club Mgmt. Co., LLC*, 641 F. Supp. 2d 196, 203 (S.D.N.Y. 2009) (concluding that Courts have consistently determined that an agreement to arbitrate may be in writing but not necessarily be signed by the party to be bound); *Sicaras v. Hartford*, 692 A.2d 1290, 1296 (Conn. App. Ct. 1997) ("Parties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated.").

law, "[a] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made." *Emeritus Senior Living v. Lepore*, 191 A.3d 212, 217 (Conn. App. Ct. 2018) (quotation marks omitted).

Procedural unconscionability relates to the "process by which the allegedly offensive terms found their way into the agreement." *Cheshire Mortg. Serv., Inc. v. Montes*, 612 A.2d 1130, 1134 n.14 (Conn. 1992) (internal quotation marks and citation omitted). It applies when there was "an absence of meaningful choice" by one of the parties. *Bender v. Bender*, 975 A.2d 636, 658 (2009) (internal quotation marks omitted). Substantive unconscionability, by contrast, relates to "the content of the contract," *Cheshire*, 612 A.2d at 1134 n.14 (internal quotation marks and citation omitted), and applies when contract terms are "unreasonably favorable" to one party, *Bender*, 975 A.2d at 658 (internal quotation marks omitted). In short, the doctrine of procedural unconscionability is "intended to prevent unfair surprise," and the doctrine of substantive unconscionability is "intended to prevent oppression." *Smith v. Mitsubishi Motors Credit of Am., Inc.*, 721 A.2d 1187, 1190 (Conn. 1998). "Prevailing on unconscionability is generally difficult, and for good reason. It asks the court to step in and undo the allocation of risk in a contract." *Tarpon Bay Partners LLC v. Zerez Holdings Corporation*, 79 F.4th 206, 224 (2d Cir. 2023).

"Under Connecticut law, a court cannot find procedural unconscionability unless the party opposing enforcement of a contractual provision has introduced some *specific* evidence of overreaching by the other party in the formation of the agreement." *DaimlerChrysler Ins. Co., LLC v. Pambianchi*, 762 F. Supp. 2d 410, 423 (D. Conn. 2011), *aff'd sub nom. DaimlerChrysler Ins. Co. v. Pambianchi*, 469 F. App'x 65 (2d Cir. 2012).

11

The Arbitration Clause is not procedurally unconscionable. Here, McLean argues that "the procedural unconscionability is palpable," since his signature and initials were forged in the Loan Agreement. (ECF No. 56 at 14.) Again, McLean consented to the Loan Agreement through ratification. Lendbuzz provided McLean with a link to the Loan Agreement, which clearly stated in bold, capital letters, that it contained an arbitration clause, which must be carefully read, and McLean did not repudiate the contract. (ECF No. 48-3 at 10-12.)

Moreover, the Arbitration Agreement itself is unremarkable, and certainly does not rise to the level of substantive unconscionability. According to McLean, the Arbitration Clause is unconscionable as it "allows Lendbuzz to file cases in court, but not [McLean]." (ECF No. 56 at 13.) McLean cites one clause that reads, "Neither you nor we waive the right to arbitrate by using self-help remedies, such as repossession, or by filing an action to recover the vehicle, to recover a deficiency balance, or for individual injunctive relief." (*Id.* (quoting ECF No. 48-3 at 11).) Thus, McLean argues, as only Lendbuzz could file a case for repossession or recovery of the Vehicle or for a deficiency balance, the Arbitration Clause is one-sided and thus substantively unconscionable. (ECF No. 56 at 13.)

As a factual matter, the Arbitration Clause permits either party to elect to arbitrate, and both parties "retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction." (ECF No. 48-3 at 11.) Moreover, Lendbuzz and McLean may elect to file an arbitration. (*Id.*) Thus, the Arbitration Clause is not, in fact, one-sided at all, and the Arbitration Clause falls far short of one that "no man in his senses, not under delusion would make, on the one hand, and which no fair and honest man would accept, on the other." *Smith*, 721 A.2d at 1190.

B.    **Victory Mitsubishi's Motion to Dismiss**

12

Victory Mitsubishi moves to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Rule 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000)).

In reviewing a motion to dismiss under Rule 12(b)(1), courts must "accept as true all material factual allegations in the complaint," and refrain from "drawing from the pleadings inferences favorable to the party asserting jurisdiction." *Whyte v. Bayview Loan Servicing, LLC*, No. 21-CV-3301, 2022 WL 4484664, at *3 (E.D.N.Y. Sep. 27, 2022) (cleaned up). "The party invoking federal jurisdiction bears the burden of proving facts to establish that jurisdiction." *Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998).

"In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings." *Lee v. Banks*, No. 23-CV-5800, 2024 WL 1657908, at *3 (S.D.N.Y. Apr. 17, 2024) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)). "The Second Circuit has explained that a challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) may be facial or fact-based." *Marvin v. Allen*, No. 23-CV-5947, 2024 WL 4290722, at *3 (S.D.N.Y. Sept. 24, 2024) (citing *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

13

570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.* at 570.  *See also Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) ("[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side."); *Marvin*, 2024 WL 4290722, at *3 (same).

In evaluating a Rule 12(b)(6) motion, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials."  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

"Generally, [courts] do not look beyond 'facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.'"  *Id.* (quoting *Concord Assocs., L.P. v. Entm't*

14

*Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)); *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d

99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its

consideration to facts stated on the face of the complaint, in documents appended to the

complaint or incorporated in the complaint by reference, and to matters of which judicial notice

may be taken." (internal quotation marks omitted)).  In most instances, "the incorporated

material is a contract or other legal document containing obligations upon which the plaintiff's

complaint stands or falls, but which for some reason—usually because the document, read in its

entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the

complaint."  *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir.

2006).

### 1.    Truth In Lending Act

The Truth in Lending Act ("TILA"), 15 U.S.C. § 1640, provides a private right of action

for damages where a creditor fails to make disclosures required by the Act, 15 U.S.C. § 1638.

The purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer

will be able to compare more readily the various credit terms available to him and avoid the

uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing

and credit card practices."  15 U.S.C. § 1601(a).  TILA defines "credit" as "the right granted by a

creditor to a debtor to defer payment of debt or to incur debt and defer its payment."  15 U.S.C.

§ 1602(f).  "Creditor" is defined by the Act as "a person who both (1) regularly extends, whether

in connection with loans, sales of property or services, or otherwise, consumer credit which is

payable by agreement in more than four installments or for which the payment of a finance

charge is or may be required, and (2) is the person to whom the debt arising from the consumer

credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." *Id*. § 1602(g).

In this case, there is no basis for McLean's TILA claims against Victory Mitsubishi because McLean does not allege that any loan transaction was consummated between McLean and Victory Mitsubishi. *Norman v. Bank of New York Mellon Tr. Co. N.A. as Tr. for Mortg. Assets Mgmt. Series 1 Tr.*, No. 24-CV-4737, 2024 WL 4558471, at *4 (S.D.N.Y. Oct. 21, 2024). Victory Mitsubishi is not a party to any loan agreement with McLean, and thus there was no consumer credit transaction between McLean and Victory Mitsubishi. Victory Mitsubishi therefore cannot have an obligation to make any TILA disclosures. *Stephens v. Capitol One Fin. Corp.*, No. 12-CV-00193, 2012 WL 2458173, at *3 (E.D.N.Y. June 22, 2012) ("[Because] defendants are not creditors of plaintiff within the meaning of TILA, any claim brought pursuant to TILA is dismissed with prejudice for failure to state a claim.").

McLean argues that his allegations of unlawful extra charges, price increase on the Vehicle itself, and VSSC price, are incident to the extension of credit and thus subject to TILA. (ECF No. 67 at 16.) McLean's citations provided in his briefing to the Court do not support this assertion. In *Joseph v. Excellence Auto Trade*, the plaintiff entered a retail installment sales contract with the defendant automobile sales business, and thus the "increase from the advertised price of the Vehicle to the cash price listed on the [retail installment sales contract] constitute[d] a hidden finance charge which should have been disclosed under TILA." No. 16-CV-1534, 2017 WL 1157178, at *3 (E.D.N.Y. Feb. 10, 2017) (quotation marks omitted). In the instant case, however, McLean did not enter into a retail installment contract with Victory Mitsubishi but rather with Lendbuzz, and thus Victory Mitsubishi was not a creditor per TILA. (*See* ECF No.

61-1 ("RPA").)[4] *Diaz v. Paragon Motors of Woodside, Inc.*, similarly is inapposite. 424 F.

Supp. 2d 519 (E.D.N.Y. 2006). Again, the *Diaz* plaintiff, unlike McLean, entered into a retail

installment contract with the defendant car dealer. *Id.* at 525-26. Moreover, in *Diaz*, the plaintiff

demonstrated a "causal connection" between the higher price of the car from that originally

advertised and the extension of credit. *Id.* at 530. Here, McLean merely states that the alleged

"fraudulent price increase" to the Vehicle was "only because [he] purchased the Vehicle on

credit and [] would not have been added had [he] purchased the Vehicle in an all-cash

transaction." (FAC ¶ 184.) However, mere "labels and conclusions" or a "formulaic recitation

of the elements of a cause of action" are not enough to survive a motion to dismiss. *Twombly*,

550 U.S. at 555.

McLean attempts to circumvent the requirement that Victory Mitsubishi be a creditor for

liability under TILA. McLean argues that because "he had no direct contact with Lendbuzz on

the day he bought the Vehicle, only with Victory Mitsubishi, and did not sign any document

electronically . . . , which is how Lendbuzz's loan agreement was signed," Victory Mitsubishi is

the initial creditor on the retail installment contract—here, the Loan Agreement. (ECF No. 67 at

15-16.) Such a logical leap is unsupported by the allegations in this case. A creditor is simply

"[o]ne to whom a debt is owed." *Creditor*, Black's Law Dictionary (7th ed. 1999); *see Marcus v.*

*Kane*, 18 F.2d 722, 723 (2d Cir. 1927) ("When colloquially expressed, a creditor may be

considered one to whom money is due, but, in the more extensive sense of the term, a creditor is

---

[4] Here, this Court can consider the Retail Purchase Agreement ("RPA") provided by Victory Mitsubishi, as it has been incorporated by reference in McLean's FAC. (*See, e.g.*, FAC ¶ 52.) *Goel*, 820 F.3d at 559.

Generally, a retail installment contract, like the Loan Agreement between Lendbuzz and McLean, concerns the terms for financing a purchase, whereas the RPA between McLean and Victory Mitsubishi only described the Vehicle being purchased. *See e.g.*, *Farrell v. Road Ready Used Cars, Inc.*, No. 17-CV-2030, 2018 WL 1936143, at *5 (D. Conn. Apr. 24, 2018).

one who has a right to recover money of another on any account whatever.")  Here, it is undisputed that McLean owed and paid the funds for the Vehicle to Lendbuzz, not Victory Mitsubishi; consequently, Lendbuzz, not Victory Mitsubishi, is the creditor.  Because McLean fails to state a claim under TILA, the TILA claims are dismissed pursuant to Rule 12(b)(6).

### 2.    Electronic Fund Transfer Act

McLean also alleges damages against Victory Mitsubishi pursuant to the Electronic Fund Transfer Act (the "EFTA").  (FAC ¶ 14.); 15 U.S.C. § 1693.  According to McLean, Victor conditioned the extension of credit from Lendbuzz on McLean's use of autopay, in violation of the EFTA.  (ECF No. 67 at 18.)  Victory Mitsubishi argues that because it is not a creditor, it cannot be liable under the EFTA.  Victory Mitsubishi is correct.

Under the EFTA, no "person" may "condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers."  15 U.S.C. § 1693k(1).  "The EFTA itself does not define 'person,' but the regulations implementing the EFTA define 'person' as 'a natural person or an organization, including a corporation, government agency, estate, trust, partnership, proprietorship, cooperative, or association.'" *Gingras v. Rosette*, No. 15-CV-101, 2016 WL 2932163, at *23 n.21 (D. Vt. May 18, 2016) (quoting 12 C.F.R. § 1005.2(j)), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019).

McLean is correct that under the EFTA's definition, Victory Mitsubishi could fall under the EFTA as an organization.  (ECF No. 67 at 19.)  However, the Second Circuit has made it clear that "[o]nly the [] institution that is the custodian of the consumer's account or the recipient of the funds transfer can be subject to liability under the [EFTA]." *L.S. v. Webloyalty.com, Inc.*, 673 Fed. App'x 100, 106 n.5 (2d Cir. 2016) (summary order).  McLean cites an out-of-circuit

district court opinion to support his EFTA claim.  (ECF No. 67 at 18-19 (citing *O'Donovan v. Cashcall, Inc.*, No. 08-CV-03174, 2009 WL 1833990 (N.D. Cal. Jun. 24, 2009).)  Although McLean states that the Court in *O'Donovan* held that similar factual allegations survived a motion to dismiss, the facts of *O'Donovan* were quite distinct from those in the case at hand.  In *O'Donovan*, the defendant was a consumer loan corporation that allegedly "require[d] all customers to agree to a provision that permit[ed] [the defendants] to make electronic debits from their bank accounts."  *O'Donovan*, 2009 WL 1833990, at *3.  Here, Victory Mitsubishi, unlike the *O'Donovan* defendant, was not the recipient of McLean's funds nor the custodian of McLean's account—Lendbuzz was.  (FAC ¶¶ 116, 123.)  Thus, Victory Mitsubishi cannot be liable under the EFTA, and McLean's EFTA claims are dismissed pursuant to Rule 12(b)(6).

### 3. Magnuson-Moss Warranty Act

McLean asserts claims against Victory Mitsubishi for breach of express and implied warranties under the Magnuson-Moss Warranty Act (the "MMWA").  The MMWA is a remedial statute designed "to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams*, 899 F.2d 1315, 1317 (2d Cir. 1990) (quoting 15 U.S.C. § 2302(a)).  To achieve these goals, the MMWA permits "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with . . . a written warranty [or] implied warranty . . . [to] bring suit for damages and other legal and equitable relief."  15 U.S.C. § 2310(d)(1).  The MMWA provides for federal jurisdiction, however, only where specified requirements are satisfied.  Relevant here, the MMWA states that MMWA claims may be brought in federal court only "if the amount in controversy [meets or exceeds] the sum or value

19

of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in [the] suit." *Id.* § 2310(d)(3)(B).

Although a plaintiff invoking federal jurisdiction must demonstrate a "reasonable probability" that the amount-in-controversy requirement is satisfied, *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) (quotation marks omitted), the Second Circuit "recognize[s] a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy," *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006) (internal quotation marks and citation omitted).  A defendant may rebut that presumption by demonstrating "to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." *Id.* (quotation marks and brackets omitted); *see also St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938) ("It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.").

McLean cannot satisfy the jurisdictional threshold.  McLean's brief in opposition to the motion to dismiss first calculates his damages as pleaded to amount to $36,829.45—the Lendbuzz loan agreement of $25,384.45; the downpayment of $10,000 downpayment and the Vehicle repairs of $1,445.  (ECF No. 67 at 23-24.)

McLean then argues that his damages must include $12,886 for TILA claims and $10,000 for conversion of his downpayment.  (*Id.*)  This argument fails for two reasons.  First the MMWA applies only to warranty claims, not to pendent state law claims.  *See Cosgrove v. Oregon Chai, Inc*, 520 F. Supp. 3d 562, 586 ("At its core . . . the MMWA merely incorporates and federalizes state-law breach of warranty claims, including state-law standards for liability and damages." (quotation marks omitted)); *Cotterell v. Gen. Motors LLC*, No. 19-CV-822, 2019

WL 6894256, at \*4, \*7-11 (D. Conn. Dec. 18, 2019) (concluding that the amount in controversy for the MMWA must be satisfied on the basis of claims brought pursuant to the MMWA, i.e., only breach of warranty claims, and pendent state law claims cannot be sued to satisfy the jurisdictional amount). Second, given that this Court has already dismissed the TILA claims, the $12,886 that McLean claims for TILA damages cannot be added to the MMWA claim, as those claims are non-cognizable. *See Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 229-30 (2d Cir. 2017) (concluding that where, from the face of the pleadings, it is apparent to a legal certainty that the plaintiff cannot recover on a certain claim, that claim is not included in the value of the calculation for the MMWA jurisdictional threshold). Thus, McLean fails to establish the requisite amount in controversy for his MMWA claim.

McLean requests leave to amend his FAC to plead punitive, consequential, and incidental damages under the MMWA. (ECF No. 67 at 23.) That request is denied. Leave to amend may be denied if the plaintiff has already been given an opportunity to amend but has failed to cure the original complaint's deficiencies. *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Here, McLean has already amended his complaint once, in response to Victory Mitsubishi's motion to dismiss McLean's initial complaint—a motion to dismiss that raised many of the same deficiencies found in the FAC, and which McLean failed to subsequently address. *See, e.g.*, ECF No. 24 at 12 ("Here, the 'total amount due' of the retail purchase agreement . . . [is] substantially below the $50,000 amount in controversy required.").

### 4.      State Law Claims

McLean asserts various state law claims against Victory Mitsubishi, as well. The Court declines to exercise supplemental jurisdiction over those claims because it has dismissed the

federal claims.  28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction"); *Marcus v. AT & T Corp.*, 138 F.3d 46, 57 (2d Cir.1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").  The FAC does not assert any basis for subject matter jurisdiction over the state law claims other than supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  (FAC ¶ 16.)  Accordingly, the state law claims are dismissed without prejudice to refiling in state court.

**C.      Conclusion**

For the foregoing reasons, Lendbuzz's motion to compel arbitration is GRANTED, and Victory Mitsubishi's motion to dismiss is GRANTED.  McLean's motion to strike is DENIED as moot.

The Clerk of Court is directed to enter judgment (1) compelling arbitration of the claims against Lendbuzz, (2) dismissing the federal claims against Victory Mitsubishi with prejudice pursuant to Rule 12(b)(6), and (3) dismissing the state law claims against Victory Mitsubishi without prejudice to refiling in state court.

The Clerk of Court is also directed to terminate the motions at ECF Numbers 47, 59, and 73, and, upon entry of judgment, to close this case.

SO ORDERED.

Dated: February 2, 2026
      New York, New York

_____
J. PAUL OETKEN
United States District Judge